IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.   23-470 |
| | : | |
| ALEXANDER PEREZ | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                                **January 21, 2025**

Philadelphia police officers responded to a call about a home invasion at Alexander Perez's residence.  Upon arrival, a police officer spoke with Mr. Perez, who was holding a shoulder bag.  An officer searched the bag and discovered a firearm with an obliterated serial number.  This had consequences: Mr. Perez was transported to the police station, where he made a statement about his purchase of the firearm and was formally arrested.  Police then secured a warrant to search his home, which uncovered suspected narcotics, mini scales, and firearm magazines and casings.  Mr. Perez was indicted for possession with intent to distribute cocaine and fentanyl and possession of a firearm in furtherance of a drug trafficking crime.  We now consider a motion questioning whether Mr. Perez willingly handed the shoulder bag to the police or if an officer took it by force.

Mr. Perez moved to suppress the firearm, his statement to law enforcement, and physical evidence recovered from his home as fruits of unconstitutional searches.  DI 23.  The Government responded to his motion, and we scheduled a hearing for September 18, 2024.  DI

29; DI 33.[1]  On September 17, Mr. Perez filed an amended motion to suppress that included the account of Yudelka Perez, Mr. Perez's sister, who allegedly witnessed officers remove the shoulder bag from Mr. Perez's body.  DI 35.  At the hearing, Officer Antonio Starkey and Detective Matthew Lemongelli testified for the Government.  Ms. Perez testified for the defense.  Following the hearing, Mr. Perez filed a supplemental motion to suppress, and the Government responded.  DI 43; DI 46.  We allowed supplemental argument at a bail review hearing on November 22, 2024.  DI 49.

As we indicated to the parties at the November 22 hearing, this motion comes down to a question of credibility, and we find Officer Starkey's testimony about how he obtained the shoulder bag, and thus the firearm, to be credible.  Having considered the parties' written submissions and evidence presented at the suppression hearing, we deny Mr. Perez's motion to suppress.

I.      **FINDINGS OF FACT**

We make the following findings of fact.  *See* Fed. R. Crim. P. 12(d) ("When factual issues are involving in deciding a motion, the court must state its essential findings on the record.").

Around 1:45 a.m. on May 20, 2023, Officer Starkey of the Philadelphia Police Department responded to a call about a possible shooting at 4735 Meridian Street in Philadelphia.  DI 38 at 7.  Officer Starkey knew from his computer dispatch system that a male had called 911 to report that "unknown black male, black hoodies, . . . armed with [] gun" had

---

[1] We adopt the pagination supplied by the CM/ECF docketing system.

broken into his house. *Id.* 16-17.  Officer Starkey did not know whether the intruder was still at the caller's residence. *Id.* at 17.

Officer Starkey was first to arrive on the scene. *Id.* at 7, 14, 17.  He was met at the door by Mr. Perez and his girlfriend. *Id.* at 7-8.  Officer Starkey conversed with Mr. Perez at the front door: Mr. Perez and his girlfriend stood at the door jamb, and Officer Starkey stood outside. *Id.* at 9.  Officer Starkey did not have his firearm out while he was speaking with Mr. Perez. *Id.* at 20.  Mr. Perez was wearing a shoulder bag. *Id.* at 16, 25.  At some point during this conversation in the doorway,[2] Mr. Perez explained that men had been inside his house on the second floor. *Id.* at 13.  He explained that an unknown man was going to shoot at him, so he had returned fire. *Id.*  Mr. Perez told Officer Starkey that he did not know if he had seen or hit the unknown man, *id.*, and that the intruders had left out the back door, *id.* at 18.

At the hearing, Officer Starkey and Ms. Perez provided starkly different accounts of how police obtained the firearm.  Officer Starkey testified that he asked Mr. Perez if he had a firearm in the bag, and Mr. Perez said "yes." *Id.* at 8, 25, 26.  He then asked Mr. Perez for the bag, and Mr. Perez handed it to him. *Id.* at 23, 25.  Officer Starkey testified that he did not use an

---

[2] The order in which the conversation at the doorway progressed is unclear.  Officer Starkey initially testified that the first thing he did when he arrived on the scene was "ask[] [Mr. Perez] if he had a firearm in his bag."  DI 38 at 8; *see id.* at 9 ("No, that was the first thing I asked."); *id.* at 13 ("I asked at the door jam if he had [the firearm]. That was the first thing that I had asked him.").  On cross examination, Officer Starkey agreed that his statement to Detective Hopkins read as if "the first thing that happen[ed]" when Mr. Perez came to the door was that Mr. Perez explained that unknown males had entered his residence." *Id.* at 15.  He agreed it is possible that Mr. Perez first told him what happened, and then he asked about the firearm. *See id.* at 16 ("Okay. I don't remember exactly.  He may have as soon as he walked to the door may have told me that and then my first response was is there a firearm in your bag.").  Given Officer Starkey's admitted memory lapse, we cannot determine whether Officer Starkey obtained the shoulder bag before or after Mr. Perez described the home invasion.

elevated voice to ask for the bag, *id.* at 22, or threaten Mr. Perez, *id.* at 29. He did not ask Mr. Perez for permission to look inside the bag or tell Mr. Perez that giving consent was voluntary. *Id.* at 26. Officer Starkey testified that he "got the gun out the bag," *id.*, and gave the bag back to Mr. Perez, *id.* at 25.

Ms. Perez's testimony began with her receiving a call from Mr. Perez and his girlfriend "at the time of the incident." *Id.* at 48. She drove "straight over" to their house. *Id.* When she arrived, she saw Mr. Perez on his front porch with two police officers in front of him. *Id.* She testified that she observed Mr. Perez's interaction with the officers from the end of the stairs that led to the house. *Id.* at 50. According to Ms. Perez, Mr. Perez had his hands up. *Id.* at 49. She testified that officers were screaming at Mr. Perez "if he has a gun," but Mr. Perez did not answer or move. *Id.* at 49, 50. She testified that officers screamed, "[I]t's in the bag, it's in the bag." *Id.* at 50. Officers then "proceeded to remove the bag off of [Mr. Perez]. *Id.* at 51.

We find Officer Starkey's testimony to be more credible and adopt his account of how he obtained the firearm as fact.[3] Though we do not question Ms. Perez's presence at the scene, there

---

[3] On a motion to suppress, the district court sits as fact finder and makes any necessary credibility judgments. *See United States v. Harris*, 507 F.2d 197, 198 (3d Cir. 1975). Factors to consider in determining credibility include:
> (1) The opportunity and ability of the witness to see or hear or know that things about which the witness testifies; (2) The quality of the witness knowledge, understanding, and memory; (3) The witness appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case of any motive, bias, or prejudice; (5) Any relation the witness may have with a party in the case and any effect that the verdict may have on the witness; (6) Whether the witness said or wrote anything before trial that is different from the witness testimony in court; (7) Whether the witness testimony is consistent or inconsistent with other [believable evidence]; and (8) Any other factors that bear of whether the witness should be believed.

Third Circuit Model Criminal Jury Instructions, Instruction 1.10-Credibility of Witnesses; *see United States v. Thompson*, No. 15-cr-222, 2015 WL 5159180, at *4 (E.D. Pa. Sept. 2, 2015).

are reasons to question her testimony. Ms. Perez's concern for her brother renders her an inherently biased witness. She testified on cross that she wants the charges against Mr. Perez dismissed. *Id.* at 54. In addition, the record is devoid of statements — by others or by Ms. Perez at some other time — that corroborate her version of events. Ms. Perez testified on cross that she did not tell anyone what she witnessed on May 20 until the day before the suppression hearing, when she spoke with defense counsel. *Id.*[4]

Officer Starkey's memory of the interaction with Mr. Perez was imperfect, but he never wavered on the key point — on direct and cross, he firmly and repeatedly testified that Mr. Perez handed him the bag. *Id.* at 8, 20, 23, 25. He testified that his statement to Detective Hopkins, made on the same day as the arrest, was the same. *Id.* at 20. Officer Starkey calmly testified, without equivocation, that he did not threaten Mr. Perez, use an elevated voice, or forcibly remove the bag from Mr. Perez's body. *Id.* at 20, 23, 29. We also consider that Officer Starkey has been a Philadelphia police officer for over six years, *id.* at 7, and any personal interest he may have in the outcome of this case is significantly less than that of the defendant's sister.

In addition, we find that Officer Starkey was the only officer present at the doorway when police obtained the firearm from Mr. Perez. Officer Starkey did not remember exactly when other officers arrived on the scene,[5] but he testified that he was the only officer present at

---

[4] Ms. Perez did not contradict Officer Starkey's testimony that the interaction took place at Mr. Perez's doorway. *See id.* at 9, 51. We note that from Ms. Perez's vantage point at the foot of the porch steps, she likely would have faced the officers' backs and therefore had an obstructed view of any physical interaction between police and Mr. Perez.

[5] *See* DI 38 at 10 (testifying that other officers had arrived at the scene by the time he walked to his vehicle to secure the firearm); *id.* at 22 ([Attorney McDonald]: "So now you say you don't recall if the second officer arrived at the time you secured the gun?" [Officer Starkey]: "Right."); *id.* at 28 ("So [other officers] arrived as I was either putting the gun away in the car or walking back at some point they pulled up.").

the doorway when he "received the gun." *Id.* at 29; *see also id.* at 9, 14. The only evidence to the contrary is the testimony from Ms. Perez, who stated that she arrived at Mr. Perez's house and saw two police officers on the porch, but only one police vehicle. *Id.* at 48, 56. If Ms. Perez's testimony were true, then Officer Starkey would have arrived on the scene with another officer in a single vehicle. Officer Starkey repeatedly testified, however, that he was working a solo shift on May 20, which was not uncommon for him, and that he arrived at the scene alone. *Id.* at 7, 59. We find this testimony credible. We also credit his testimony that his documentation from the incident would have included the partner's name if one had been present, which it did not. *Id.* at 59.

After obtaining the firearm, Officer Starkey took it to his vehicle, where he unloaded and secured it. *Id.* at 10. He did not inspect the firearm at this point. *Id.* at 24. He then walked back towards Mr. Perez. *Id.* Later, while completing a property receipt for the firearm, Officer Starkey noticed that the serial number on the weapon was altered. *Id.* At 6:37 a.m. that morning, Officer Starkey gave a statement to Detective John Hopkins outlining his interaction with Mr. Perez. *Id.* at 12-13.

Mr. Perez and his girlfriend were transferred to the police station. Detective Hopkins interviewed Mr. Perez at the Northeast Detective Division, and Detective Matthew Lemongelli recorded the interview. *Id.* at 32, 34. Mr. Perez was given *Miranda* warnings and signed a written waiver of his *Miranda* rights. *Id.* at 35; *see* DI 29-2. Mr. Perez stated that he had purchased the firearm on "the streets." DI 23 at 3; DI 29 at 4. Mr. Perez was formally arrested for possessing a firearm with an obliterated serial number and for two outstanding misdemeanor warrants. DI 23 at 4; DI 29 at 3.

Detective Lemongelli sought a search warrant for Mr. Perez's residence to recover "ballistic evidence, forensic evidence, and any firearms." DI 29-1 at 3. Prior to applying for the warrant, Detective Lemongelli reviewed Officer Starkey's interview with Detective Hopkins. DI 38 at 38-39. The search warrant indicated that police were investigating "Burglary, Aggravated Assault, and VUFA obliterated serial #." DI 29-1 at 3. In the warrant affidavit, Detective Lemongelli stated that upon police arrival at Mr. Perez's residence earlier that morning, "complainant . . . and the witness . . . informed police they heard intruders inside their home." *Id.* at 5. It stated that "[o]ne of the intruders fired at the complainant and the complainant returned fire." *Id.* It stated that complainant had "surrendered his weapon" which "was later determined to have obliterated serial numbers." *Id.* It also described Mr. Perez's later statement at the police station in which he "admitted to buying the weapon illegally off the street." *Id.* The search warrant was granted. *See id.* at 3.

Police executed the search warrant on May 20, 2023 at 11:15 a.m. *Id.* at 4. They recovered plastic baggies containing white substances, two mini weight scales, and firearm casings and magazines, among other items. *Id.* at 2, 4.

## II.     STANDARD OF REVIEW

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* The Government's burden is a preponderance of evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974); *see United States v. Vaghari*, 653 F. Supp. 2d 537, 543 (E.D. Pa. 2009).

7

### III. CONCLUSIONS OF LAW

Mr. Perez argues that the search of the shoulder bag, which uncovered the firearm, violated the Fourth Amendment. DI 35 at 5. He also argues that the search warrant affidavit lacked the requisite probable cause to justify the search of his home. *Id.* at 6. He moves to suppress the firearm, his statement to law enforcement, and physical evidence recovered from his home. The Government argues that Mr. Perez consented to the search of the bag, and there was a substantial basis for finding probable cause to issue the search warrant. DI 29.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Under the Fourth Amendment, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Walker v. Coffey*, 905 F.3d 138, 145 n.20 (3d Cir. 2018). There is no dispute here that police searched Mr. Perez's shoulder bag and residence. The relevant question is whether the searches were reasonable.

**A. Mr. Perez voluntarily consented to the search of his bag, rendering the search reasonable under the Fourth Amendment.**

"Searches conducted absent a warrant are *per se* unreasonable under the Fourth Amendment, subject to certain exceptions." *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (citing *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012)); *see California v. Acevedo*, 500 U.S. 565, 580 (1991). An "established exception[]" to the warrant requirement is "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that

8

consent was in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Consent that is "the product of duress or coercion, express or implied" is not voluntary. *Schneckloth*, 412 U.S. at 227.

To determine voluntariness, courts examine the totality of the circumstances. *Id; Stabile*, 633 F.3d at 231; *see United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). Relevant factors include the "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment," as well as "[t]he setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." *Stabile*, 633 F.3d at 231 (quoting *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009)); *see Givan*, 320 F.3d at 459 (referring to "critical factors" such as setting, verbal and non-verbal actions, age, intelligence, and educational background). Though "the Government need not inform the subject of his right to refuse consent," *Stabile*, 633 F.3d at 231, his knowledge of this right is "one factor to be taken into account," *Schneckloth*, 412 U.S. at 227. "[C]onsent is not merely acquiescence to a claim of lawful authority, nor is it dependent upon any affirmative assertion of rights by the subject." *Gov't of Virgin Islands v. Berne*, 412 F.2d 1055, 1058 (3d Cir. 1969) (internal quotations omitted).

Here, factors typically representative of duress or coercion, such as threats, physical force, or prolonged questioning, were not present. The credible evidence demonstrates that Officer Starkey did not act in a hostile manner towards Mr. Perez. During the conversation at the doorway, Officer Starkey did not show his firearm, yell, or threaten Mr. Perez. DI 38 at 20, 22, 29. Rather, Officer Starkey asked Mr. Perez if he had a firearm in his bag, and Mr. Perez said "yes." *Id.* at 8, 25, 26. Officer Starkey asked for the bag, and Mr. Perez handed it to him —

9

the bag was not wrenched from Mr. Perez's body. *Id.* at 8, 20, 25; *see United States v. London*, 2:09cr105, 2013 WL 12202651, at *2-3 (W.D. Pa. May 14, 2013) (finding consent was voluntary after crediting an agent's testimony that he asked to search the bag, and agents did not threaten defendant or show their weapons during the encounter). Mr. Perez stood within the doorway of his own home during the interaction with Officer Starkey. DI 38 at 9, 27. He was not at a police station or otherwise trapped within a confined space. *Compare United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) (finding consent was voluntary where officer asked a defendant what was inside of a bag, and defendant handed it to him) *with United States v. Ruiz-Estrella*, 481 F.2d 723, 728 (2d Cir. 1973) (finding consent involuntary where agent requested the bag and defendant handed it to him, but only after agent took the defendant into a stairwell and closed the door behind them).

Furthermore, nothing in the record suggests that Mr. Perez's age, intelligence, or educational background limited his ability to consent voluntarily to the search. *See Givan*, 320 F.3d at 459. Though Officer Starkey did not inform Mr. Perez of his right to refuse consent, this fact alone is not controlling. *See Schneckloth*, 412 U.S. at 277; *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994).

After assessing the totality of the circumstances, we conclude that Mr. Perez voluntarily consented to the search of the bag. Because he provided voluntary consent, the warrantless search of the bag was reasonable and complied with the Fourth Amendment. *See Stabile*, 633 F.3d at 231 ("[B]ecause [defendant] voluntarily consented to the search, the initial warrantless search . . . did not violate the Fourth Amendment."). The search of the bag does not provide a basis to suppress the firearm, Mr. Perez's statement, or physical evidence obtained from Mr. Perez's home.

**B. The magistrate judge had a substantial basis for finding probable cause existed to search Mr. Perez's home.**

Mr. Perez also argues that physical evidence found at his home should be suppressed because Detective Lemongelli's search warrant affidavit contained insufficient facts to establish probable cause. DI 35 at 5-6.

To secure a valid search warrant for a home, "the government must present probable cause that evidence of criminal activity will be found in the place to be searched." *United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022) (citing *Smith v. Ohio*, 494 U.S. 541, 542 (1990)). "[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.'" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *Alexander*, 54 F.4th at 171. To establish probable cause, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

We afford "great deference" to a magistrate's determination of probable cause. *Id.* at 236; *United States v. Miknevich*, 638 F.3d 178, 181 (3d Cir. 2011). A district court must uphold the warrant so long as the magistrate had a "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 238. To make this determination, we consider only "the facts that were before the magistrate, *i.e.*, the affidavit." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). The affidavit "must be read in its entirety and in a common sense and nontechnical manner." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997); *see United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) ("Moreover, statements in an affidavit may not be read in isolation — the affidavit must be read as a whole.").

The Lemongelli affidavit stated that police had responded to Mr. Perez's residence earlier that morning, where Mr. Perez and his girlfriend "informed police they heard intruders inside their home." DI 29-1 at 5. It stated that one of the intruders had fired at Mr. Perez, and Mr. Perez had returned fire. *Id.* It further stated that Mr. Perez had surrendered a Glock semi-automatic pistol which was later determined to have an obliterated serial number. *Id.* The affidavit described how Mr. Perez admitted to buying the weapon illegally off the street, and that he was subsequently arrested for possession of the firearm with the obliterated serial number and for having two bench warrants. *Id.*

Reading the Lemongelli affidavit in its entirety, it provided a substantial basis for the magistrate judge to find probable cause. We recognize that "probable cause to arrest does not automatically provide probable cause to search the arrestee's home." *Jones*, 994 F.2d at 1055. The mere fact of Mr. Perez's arrest for possessing a firearm with an obliterated serial number, and for two open bench warrants, did not necessarily establish probable cause to search his home.[6] But the affidavit also described the events leading up to the arrest — the home invasion, the exchange of gunfire, and Mr. Perez's statement regarding his purchase of the firearm. This context makes clear that police were investigating not just Mr. Perez's arrest but also the home invasion. Because the home invasion occurred at Mr. Perez's home, one would logically assume that evidence related to the home invasion, including forensic and ballistic evidence, would be found there. It is immaterial that Mr. Perez did not perpetrate the home invasion. *See Conley*, 4.

---

[6] The Third Circuit in *Jones* left open the question of "whether in *every* case the fact that a suspect committed a crime involving . . . a gun automatically provides a magistrate with enough information to approve a search of a suspect's home." *Jones*, 994 F.2d at 1056 (emphasis added). Because the Lemongelli affidavit contained more information than the fact of the arrest alone, we need not address that question today.

F.3d at 1206-7 ("This was not an arrest warrant — it was a search warrant. The facts provided in the affidavit provided probable cause to believe that evidence of illegal gambling, not necessarily on the part of the owner . . . would be present at [the residence].").

The facts in the affidavit also establish a "sufficient nexus" between Mr. Perez's alleged criminal activity and the place for which the search warrant was sought. *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001); *see United States v. Harris,* 884 F. Supp. 2d 383, 393 (W.D. Pa. 2012) (applying *Hodge*). While police did not observe Mr. Perez engage in criminal activity within his home, or learn the same from a reliable source, the affidavit listed other "direct evidence linking the place to be searched to the crime." *Conley*, 4 F.3d at 1207. The affidavit outlined that Mr. Perez discharged a firearm, later determined to be illegally purchased, in his home. DI 29-1 at 5. Police recovered the firearm from Mr. Perez at his home. *Id.* Furthermore, a magistrate is "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)); *c.f. Jones*, 994 F.2d at 1051 ("[P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." (internal quotations omitted))). A magistrate judge could reasonably infer that the presence of one illegally obtained firearm at the residence meant that additional firearms would also be found there. *See Jones*, 994 F.2d at 1057 ("The presence of some stolen property in Daniel's residence reasonably could have suggested . . . that other contraband was not far away.").

Ultimately, "an affidavit 'should not be judged as an entry in an essay contest, but, rather, must be judged by the facts it contains.'" *Conley*, 4 F.3d at 1207 (quoting *United States v.*

13

*Harris*, 403 U.S. 573, 579 (1971)).  The fact of Mr. Perez's arrest, coupled with the events of that morning, provided a substantial basis to conclude that probable cause existed — in other words, that there was a fair probability that forensic evidence, ballistics evidence, and firearms would be found at Mr. Perez's residence.  *See Gates*, 462 U.S. at 238.  To inquire any further would run afoul the "great deference" that we owe a magistrate's probable cause determination. *Id.* at 236.  We conclude that the search warrant was valid, and the search of Mr. Perez's residence was reasonable under the Fourth Amendment.[7]  We therefore deny Mr. Perez's motion to suppress physical evidence recovered during the search.

### IV.  CONCLUSION

For the foregoing reasons, Mr. Perez's motion to suppress is denied. An appropriate order follows.

---

[7] Because we conclude that the search warrant was valid, we need not address whether the good faith exception should apply.